# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: March 16, 2026

```
* * * * * * * * * * * * * *   *
ELISA GARCIA,                 *
                              *
                              *
            Petitioner,       *        No. 19-1952V
                              *
 v.                           *        Special Master Young
                              *
SECRETARY OF HEALTH           *
AND HUMAN SERVICES,           *
                              *
            Respondent.       *
* * * * * * * * * * * * * *   *
```

*Ronald Craig Homer*, Conway, Homer, P.C., Boston, MA, for Petitioner.
*Sarah Christina Duncan*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION ON ENTITLEMENT[1]

On December 26, 2019, Elisa Garcia ("Petitioner") filed a petition in the National Vaccine Injury Compensation Program (the Program"),[2] alleging that "[a]s a result of receiving the [influenza ("flu")] vaccination on September 29, 2017, [she] suffered an adverse skin reaction, including, but not limited to rash and hives." Pet. at 1, ECF No. 1.

A careful analysis and weighing of all the evidence and testimony presented in this case in accordance with the applicable legal standards,[3] reveals that Petitioner has failed to provide

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755 ("the Vaccine Act" or "Act"). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the decision will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding

preponderant evidence that her flu vaccination caused her to suffer from an adverse skin condition. Accordingly, Petitioner is not entitled to an award of compensation.

## I.    Procedural History

Petitioner filed her petition on December 26, 2019. Pet. Petitioner filed medical records, affidavits from herself and her husband, and a statement of completion on February 5, 2020. Pet'r's Exs. 1–3, ECF No, 7; Pet'r's Exs. 4–6, ECF No. 8; ECF No. 11. On September 16, 2020, Respondent filed his Rule 4(c) report opposing compensation. Resp't's Rept., ECF No. 18.

On January 27, 2022, Petitioner filed an expert report from Richard F. Horan, M.D., his curriculum vitae ("CV"), and medical literature. Pet'r's Exs. 7–14, ECF No. 25. On August 15, 2022, Respondent filed an expert report from Emanual Maverakis, M.D., his CV, and medical literature. Resp't's Ex. A, Tabs 1–10, ECF No. 30; Resp't's Ex. A, Tabs 11–19, Resp't's Ex. B, ECF No. 31. Petitioner filed a supplemental expert report from Dr. Horan on July 5, 2023. Pet'r's Ex. 23, ECF No. 35. Respondent responded with a supplemental report from Dr. Maverakis and additional medical literature on October 3, 2023. Resp't's Ex. C, Tabs 7–8, 11–16, ECF No. 42.

In August of 2024, the parties requested that the case be decided on the written record without a hearing. Informal Comm., docketed Aug. 7, 2024. On October 15, 2024, Petitioner filed a motion for a ruling on the record. Pet'r's Mot., ECF No. 44. Respondent filed a responsive brief on December 19, 2024. Resp't's Resp., ECF No. 46. And on January 28, 2025, Petitioner filed a reply brief. Pet'r's Reply, ECF No. 48. This matter is now ripe for consideration.

## II.    Factual History

### A. Medical Records

#### 1.  Pre-Vaccination Medical Records

Petitioner's pre-vaccination history is significant for tobacco use, trigger finger, Bell's palsy, gastroesophageal reflux disease, deep vein thrombosis, chronic low back pain, somatic symptom disorder, anxiety disorder, hypertension, breast cancer, sleep apnea, post-traumatic stress disorder, hyperlipidemia, chronic obstructive pulmonary disorder ("COPD"), bipolar disorder, and chronic fatigue syndrome. Pet'r's Ex. 2 at 117–253; Pet'r's Ex. 3-1; Pet'r's Ex. 3-2; Pet'r's Ex. 3-3; Pet'r's Ex. 3-4; Pet'r's Ex. 3-5 at 2001–424. In August of 2016, Petitioner presented to her primary care provider ("PCP"), Sacramento Veteran's Affairs Medical Center, ("VA") with a "recently developed rash to bilateral lower legs." Pet'r's Ex. 2 at 171. She reported that the rash had appeared two days prior and an assessment revealed "[p]ettiche[4] [sic] scattered over left anterior lower leg and anterior and posterior [right] lower leg." *Id.* Petitioner denied any pain or

---

certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

4 Petechia is "a pinpoint, nonraised, perfectly round, purplish red spot caused by intradermal or submucous hemorrhage." *Petechia*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=38200&searchterm=petechia (hereinafter, "DORLAND'S").

itching. *Id.* She explained that she was pre-medicated with Benadryl and prednisone to prevent a skin reaction during a computed tomography ("CT") scan to follow up chemotherapy and radiation. *Id.* She stated that "she had mild rash and itching under breasts right after CT scan which quickly disappeared." *Id.*

Petitioner was 63 years old when she received the flu vaccine at issue on September 29, 2017. Pet'r's Ex. 1. She previously received flu vaccines in 2004, 2006, and annually from 2010 through 2019. Pet'r's Ex. 4 at 2.

### 2.  Post-Vaccination Medical Records

On October 2, 2017, Petitioner called her health care provider's nurse advice line with complaints of an itchy rash with welts on the torso, arms, and breasts that had been occurring for three days. Pet'r's Ex. 3-5 at 2437. She reported that she had recently received a flu shot and been camping and was concerned about an allergic reaction. *Id.* She indicated that Claritin and Benadryl provided no relief. *Id.* Petitioner was scheduled for a same-day appointment and presented to Dr. Puneet Kaur at the Kaiser Permanente ("KP") adult medicine station complaining of an allergic reaction presenting as an itchy rash on her arms and chest since the week prior. *Id.* at 2429. Petitioner reported that she had been camping the week before but denied any insect bites or poison oak exposure. *Id.* at 2430. She admitted having used a new body lotion. *Id.* On examination, Dr. Puneet noted "erythematous maculopapular dermatitis on arms and chest." *Id.* at 2431. She was advised to discontinue the body lotion, use mild soaps, apply steroid cream and topical Benadryl, and take Pepcid. *Id.*

On October 13, 2017, Petitioner called KP to report that her rash had not improved, despite following medical advice, and that at times it was worse. Pet'r's Ex. 3-5 at 2453. She also reported diarrhea within an hour after eating. *Id.* On October 17, 2017, Petitioner returned to KP for acute COPD exacerbation and worsening rash for three and half weeks. *Id.* at 2468. On examination, Petitioner had an erythematous rash on her arms, thighs, and abdomen, with some flakiness on the elbow. *Id.* at 2469. The physician noted psoriasis[5] as a possibility and planned to refer her to dermatology for biopsy if she did not improve. *Id.* at 2468. Petitioner called KP again on October 22, 2017, and reported that she had completed a prednisone taper, and that her rash seemed to have improved somewhat but was still present on her stomach and legs. *Id.* at 2480. She also reported that the rash generally itched after the antihistamine wore off. *Id.*

Petitioner presented to the emergency department ("ED") at the VA on October 27, 2017, with complaints of an urticarial rash beginning one day after her flu vaccine. Pet'r's Ex. 2 at 103. She reported having been seen at KP and given prednisone, Claritin, and Pepcid with some improvement, but reported that the rash worsened after she finished the course of steroids. *Id.* The impression was hives. *Id.* at 106. The attending physician prescribed another steroid taper and referred Petitioner to dermatology. *Id.* On October 31, 2017, Petitioner presented to dermatologist Wen En Kuo, regarding her rash that began after she received her flu shot on September 29, 2017. Pet'r's Ex. 3-5 at 2498. Petitioner reported that a five-day course of prednisone had helped but

---

[5] Psoriasis is "any of a group of common, chronic, squamous dermatoses with variable symptoms and courses." *Psoriasis*, DORLAND'S; Dermatosis is "any skin disease, especially one not characterized by inflammation." *Dermatosis*, DORLAND'S.

made her manic, and the rash had returned after she finished, despite her continuing on Claritin. *Id.* She rated the itching at 4/10 and indicated that it was not constant. *Id.* On examination, Petitioner had pink, mildly scaly macules and papules on her thighs, legs, arms, palms, lower back, and trunk. *Id.* at 2499. The impression was dermatitis versus urticaria. *Id.* Dr. Kuo prescribed steroid cream and Zyrtec and performed a punch biopsy on Petitioner's left thigh. *Id.* The biopsy findings were compatible with a dermal hypersensitivity reaction, but an urticarial process remained a possibility. Pet'r's Ex. 3-6 at 2502. Other considerations included a drug eruption or allergic irritant contact dermatitis. *Id.*

On November 13 and 14, 2017, Petitioner corresponded with Dr. Kuo via patient secure messaging regarding her biopsy results and the potential cause of her rash. Pet'r's Ex. 3-6 at 2527. She reported that the rash was still there, "going on [three] months," despite her use of dye-free and sensitive skin products. *Id.* Dr. Kuo responded and identified dermal hypersensitivity reaction, hives, or drug rash as three possibilities. He wrote, "I think the flu shot can cause this. I think dermal hypersensitivity reaction or a drug rash is the most likely. Given that you got the flu shot and the rash appeared, flu shot is the likely culprit." *Id.* Petitioner wondered if "this reaction was from the flu shot shouldn't it be clearing up by now, I had the shot on the 29th of Sept. also, does this mean I am now allergic to eggs?" *Id.* Dr. Kuo then asked whether Petitioner had started any other medications, moisturizers, soaps, laundry detergent, or fragrance prior to the rash, and suggested that Petitioner could try not eating eggs for a month to see if the rash resolved. *Id.* In a follow up email sent December 7, 2017, Petitioner reported to Dr. Kuo that she still had the rash and had been using the same products for years. *Id.* at 2529.

Notes from a follow-up appointment with Dr. Kuo on December 20, 2017, noted a few areas of pink wheals on her back and waist with eczematous patches on the inferior buttocks, antecubital arms, and popliteal areas. Pet'r's Ex. 3-6 at 2592. Petitioner reported that she had not started any new products prior to the onset of symptoms, and while she had received a flu vaccine "a few days prior," she had received the flu shot annually for years. *Id.* at 2591. The rash was positive for dermatographism and areas of excoriation. *Id.* at 2592. Dr. Kuo recorded his impression as dermatitis/urticaria, which he felt was not likely due to a drug and might be self-limiting. *Id.* Dr. Kuo advised Petitioner to continue topical steroids, increase her antihistamine dose, and stop scratching the rash. *Id.*

On January 13, 2018, Petitioner called KP and reported that dermatology had diagnosed her with a reaction to the flu shot and that her skin was inflamed and itching. Pet'r's Ex. 3-6 at 2624. Petitioner inquired whether her COPD could be affected as well and asked whether prednisone might be helpful for "general inflammation." *Id.* She reported that the rash had cleared up significantly but worsened at night. *Id.* The on-call physician felt that Petitioner needed to be seen before receiving another prednisone prescription. *Id.* at 2625. Later that day, Petitioner presented to KP but was referred back to her PCP. *Id.* at 2629–35. On January 28, 2018, Petitioner presented to the VA ED with "a continuous allergy attack." Pet'r's Ex. 2 at 88. She reported that she had been having hives since she received a flu shot, and had tried numerous medications, eliminated household products, and stopped taking medications without relief. *Id.* On examination, Petitioner had mild, diffuse, readily blanching wheals over the torso and thighs. *Id.* at 90. The impression was chronic urticaria of unknown etiology and uncertain significance. *Id.* Petitioner was referred to an allergist. *Id.* at 91.

On January 29, 2018, the following day, Petitioner presented to allergist Suzanne Teuber, M.D., for an "almost continuous urticarial eruption since November [sic] 2017 when she received a flu shot." Pet'r's Ex. 2 at 79. Petitioner reported that the rash began the evening after her flu shot in September. *Id.* at 80. She further reported that medications had not helped, nor had eliminating potential allergens. *Id.* Dr. Teuber noted that Petitioner's rash was "not typical of urticaria. Very pruritic." *Id.* On examination, Petitioner had a macular, erythematous, blotchy rash without visible scale or obvious wheal that blanched on the upper thighs, hips, posterior thighs, and popliteal area with excoriations present. *Id.* at 82. Dr. Teuber noted that the rash had apparently resolved from the medial arms. *Id.* A medical resident's assessment was noted as "[e]czematous dermatitis vs urticaria (not present today) possibly due to recent flu shot." *Id.* at 87. Dr. Teuber's impression was "[r]ash, not clearly urticaria based on today's exam[ination] and history of 'rash stays and never goes away.'" *Id.* 82. Dr. Teuber increased Petitioner's antihistamine dose and prescribed levocetirizine and recommended that Petitioner continue using the emollients prescribed by the dermatologist. *Id.* Allergy testing performed the following day was highly positive for allergies to Bermuda and rye grass. *Id.* at 59–60. On February 12, 2018, Petitioner had a follow-up call with Dr. Teuber and reported that levocetirizine was "somewhat helpful," but the lesions had remained. *Id.* at 78. Dr. Teuber's impression remained non-urticarial rash because the lesions stayed in the same place and did not come and go like urticaria. *Id.* at 79. Dr. Teuber increased Petitioner's levocetirizine and Zyrtec doses. *Id.*

Petitioner returned to Dr. Kuo on February 13, 2018, and on examination, Petitioner had pink/red erythema of the skin on her medial thighs, legs, and arms. Pet'r's Ex. 3-6 at 2675. His impression was dermatitis, possibly due to the flu shot, but Dr. Kuo noted that a "type IV hypersensitivity reaction does not last this long." *Id.* Dr. Kuo prescribed a steroid ointment and light therapy. *Id.* Between May 29 and July 2, 2018, Petitioner underwent eight ultraviolet ("UV") light therapy sessions. *Id.* at 2813–911. On July 13, 2018, Petitioner emailed Dr. Kuo and reported that light therapy had helped, but that she was feeling increasingly claustrophobic with each session. *Id.* at 2919. She reported that the hives were now gone with just a rash remaining, and she wanted to do additional therapy only as needed if the hives returned. *Id.* Petitioner also asked whether she should get a flu shot the following season, because he had told her it was the most likely culprit. *Id.* Dr. Kuo responded: "[M]y inclination is to hold off on the flu shots in the future. . . . I am not absolutely positive that the rash is from the flu shot, although it is probably the most likely cause. If you get another flu shot and the rash starts again, then I think that would be the confirmation (but I am not sure if you want to go through the rash again)." *Id.* He advised Petitioner to stop light therapy if it was making her claustrophobic and use the steroid ointment and antihistamines to treat the rash. *Id.*

## B. Affidavits

### 1. Petitioner

Prior to her vaccination, Petitioner described herself as "relatively healthy," managing "several minor health concerns." Pet'r's Ex. 4 at ¶ 1. She noted her breast cancer diagnosis in 2015 and the side effects, including skin irritation "contained to her face [that] did not itch." *Id.* at ¶ 2. This skin condition "resolved after completion of chemotherapy in November 2015 and radiation

in January 2016." *Id.* Petitioner detailed a second skin condition that resulted from contact dye that was administered during a CT scan. *Id.* at ¶ 3. She noted that she developed "a rash on both [her] lower legs and under [her] breasts." *Id.* She noted that reaction resolved completely in less than a week. *Id.*

Petitioner noted that she has "received annual flu shots over the years without any concerns." Pet'r's Ex. 4 at ¶ 4. She did not have a prior history of latex or egg allergy. *Id.* In the evening hours following her September 29, 2017 flu vaccination, she described new symptoms.

> I noticed several pink splotches on my arms and chest. It was not terribly bothersome at the time. However, when I awoke the next morning, the rash had spread to my legs, neck, back, and scalp. The only areas not really affected were my palms and bottoms of my feet. I also had a very warm sensation all over and it felt like my skin was burning. I could feel how hot my skin was by touching it. In addition, the rash had become very itchy. I also experienced some minor difficulty breathing, as my throat felt swollen, but I could still swallow. I had already been taking Claritin for seasonal allergies, but also ran out to buy some Benadryl to try and combat whatever reaction I was experiencing. The medications helped clear up the swelling in my throat but did not alleviate the rash.

*Id.* at ¶ 5. Petitioner continued that the rash remained over several weeks and "appeared to become even more widespread." *Id.* at ¶ 7.

Petitioner recounted her treatment with Dr. Kuo and his assertion that "the most likely culprit was the flu vaccine." Pet'r's Ex. 4 at ¶ 12. She detailed all of the strategies she tried to treat the rash which persisted on "almost the entirety of [her] body, with the exception of [her] face." *Id.* She further described her unsuccessful treatment with allergist Dr. Teuber. *Id.* at ¶ 13. She wrote that "[f]or about eight months, the rash never cleared up, even with all of the different treatments that [she] tried." *Id.* at ¶ 14. Even after the burning sensation she experienced subsided, Petitioner explained that "the rash that remained was visually unappealing." *Id.* Finally, "[a]fter almost nine months, [she] began to see improvement in [her] skin as far as the hives were concerned, but [she] did have some scarring." *Id.* at ¶ 15. Petitioner expressed frustration at being advised against receiving future flu vaccines, because "[d]ue to [her] history of receiving chemotherapy treatments, which compromised [her] immune system, [she] frequently worried about getting sick." *Id.* at ¶ 16.

### 2. Michael Brache (Petitioner's husband)

Mr. Brache wrote that Petitioner "showed [him] a rash that was starting to form on the evening of September 28, 2017, after she had the flu shot earlier in the day." Pet'r's Ex. 6 at ¶ 3. He watched it get worse in the coming days, stating it "looked like a bunch of hives on top of each other, creating what looked like a mound on her skin." *Id.* He remembered taking her for treatments that did not work and described his wife as miserable. *Id.* at ¶ 4. He too expressed concern at her inability to get flu shots in the future given her compromised immune system as a cancer survivor. *Id.* at ¶ 6.

6

III.    **Expert Review**

A.    **Expert Qualifications**

1.    **Petitioner's Expert, Richard F. Horan, M.D.**

Dr. Horan is board certified in internal medicine, dermatology, and allergy and immunology and is currently an Assistant Clinical Professor of Dermatology at Harvard Medical School. Pet'r's Ex. 8 at 2. He received his M.D. from Harvard Medical School and completed his internship and residency at New England Deaconess Hospital. *Id.* He also completed his dermatology residency at Massachusetts General Hospital. *Id.* He completed fellowships in rheumatology-immunology at New England Medical Center and in dermatology and allergy at Brigham and Women's Hospital. *Id.* Dr. Horan currently has hospital appointments at Brigham and Women's Hospital, Faulkner Hospital, and the Dana Farber Cancer Institute. *Id.* at 3. He also has published numerous articles relating to the field of immunology. *Id.* at 6–9.

2.    **Respondent's Expert, Emanual Maverakis, M.D.**

Dr. Maverakis is a board-certified dermatologist and is a professor and the Director of Autoimmunity and Immune Monitoring at the University of California, Davis. Resp't's Ex. A at 1. He received his M.D. from Harvard Medical School, where he also completed his medical internship and fellowship in immunology. Resp't's Ex. B at 2. He completed his residency in dermatology at the University of California, Davis and completed a fellowship in molecular immunology at the Howar Hughes Medical Institute. *Id.* Dr. Maverakis has published articles relating to molecular mimicry, antigen processing, and T cell analysis. Resp't's Ex. A at 1. He currently specializes in "treating patients with immune-mediated diseases, including patients with severe and treatment-refractory urticaria." *Id.* at 2.

B.    **Expert Reports**

1.    **Petitioner's Expert, Dr. Horan**

In his initial written report, Dr. Horan identified the issues in this case as "[Petitioner's] diagnosis, and whether or not the flu vaccine she received on September 29, 2017[,] caused or substantially contributed to her resulting skin risk." Pet'r's Ex. 7 at 2–3. With respect to the diagnosis, "the description is quite classic for urticaria, save for the observation that the rash was persistent." *Id.* at 3. In particular, "the upper respiratory obstructive symptoms on the morning after [Petitioner's] immunization, which correlated with some intensification of the rash in the skin, would be typical for an urticarial type reaction." *Id.* Dr. Horan explained that the characterization of a rash as persistent is "a difficult point" because "there may be some fluctuation in intensity or severity, or even clearing locally." *Id.* In Petitioner's case, the reported complaints including, "the suffusion, or warmth of the skin and warmth to the touch, which [Petitioner] noted on the second day of her rash, are quite typical of urticaria." *Id.* Dr. Horan stated that Petitioner's

complaints are "not [] typical for a dermal hypersensitivity reaction." *Id.* He added that "[a] dermal hypersensitivity reaction is a poorly understood clinicopathologic entity" that may be caused by medications, including vaccines. *Id.*

According to Dr. Horan, Petitioner's flu vaccine caused her to suffer from a hypersensitivity reaction that resulted in urticaria. Pet'r's Ex. 7 at 4. He cited to Magen et al.[6] to argue that flu specifically "is known to be associated with urticaria post vaccination." *Id.* He continued that expected symptoms include significant itch and secondary symptoms, "which arise from altered sleep patterns related to itch." *Id.* Dr. Horan wrote that vaccination causation of urticaria "is never clear for a specific patient seen in routine clinical practice." *Id.* However, he hypothesized an IgE-mediated mechanism, "include[ing] eiptopes [sic] related to the [flu] vaccine itself, to hemagglutinin proteins present in the vaccine or to some other material." *Id.* Dr. Horan explained that "[t]rue IgE mediated hypersensitivity reaction can occur almost immediately," and acknowledged that urticaria is typically considered to be an immediate reaction. *Id.* However, he asserted that urticaria can manifest as a delayed reaction with symptom onset within hours up to two or three weeks. *Id.* He identified the preservative 2-phenoxyethanol present in some flu vaccines as a potential allergic antigen but could not say if it is relevant to Petitioner's case. *Id.* He concluded that vaccine causation "is far and away the most probable explanation given the course of the reaction and the lack of any other precipitant." *Id.*

Recounting the sequence of events and the temporal relationship between the vaccination and the symptom onset, Dr. Horan argued that the appearance of a rash on Petitioner's arms and chest within hours of her flu shot is "a medically appropriate time interval" to support causation. Pet'r's Ex. 7 at 4. Furthermore, Dr. Horan noted that Petitioner had "no history of new medication antecedent to the development of the rash, and no additional factors were identified in the [Petitioner's] history to suggest an alternative, more likely cause for her urticaria." *Id.*

There were three case reports that were filed and later highlighted by Dr. Horan to illustrate a flu vaccine hypersensitivity reaction. The first case involved an 11-year-old who developed urticaria and asthma following a flu vaccination. Pet'r's Ex. 11.[7] She developed hives 48 hours later and the reaction continued for nine days before subsiding with no recurrence. *Id.* at 1. The authors noted that the patient did not have an egg allergy but "did show positive skin test reactions to flu B and bivalent flu vaccine. *Id.* at 2. The next case was a 37-year-old male who suffered from anaphylaxis fifteen minutes after inoculation. Pet'r's Ex. 9.[8] Coop et al. noted that "[i]ndividuals may be allergic to the inactivated [flu] virus in the vaccine," and in the case study, the clinical symptoms supported a belief that the "patient [was] allergic to the infectious agent (hemagglutinin)." *Id.* at 4. The third case was a case of urticarial vasculitis with a photograph and paragraph description reproduced in full below:

---

[6] Eli Magen et al., *Chronic Spontaneous Urticaria Following Vaccination*, 6 INT'L J. ADVANCED RSCH. 1434 (2018).

[7] Leon Horowitz, *Urticaria Subsequent to Administration of Influenza Vaccination*, 72 SOUTHERN MED. J. 1334 (1979).

[8] Christopher A. Coop et al., *Anaphylaxis from the Influenza Virus Vaccine*, 146 INT'L ARCHIVES ALLERGY & IMMUNOLOGY 85 (2008).

> A 70 year old woman presented with a 10 day history of painful burning rash on her buttocks associated with fever, rigor, and generalized myalgia, which started 48 hours after receiving inactivated influenza vaccine Split-Virion). Tender urticated erythematous plaques on her buttocks left bruise-like confluent patches after three days. Biopsy confirmed urticarial vasculitis. Cutaneous and systemic vasculitis can develop after flu vaccination, usually within a few weeks. Clinicians must be aware of this complication and inform patients accordingly. The official product labelling lists this side effect, but the frequency unknown. The photo was taken 26 days after vaccination; her disease activity was fluctuating.

Pet'r's Ex. 10 at 1.[9]

Magen et al. sought to determine if chronic spontaneous urticaria ("CSU") may be an autoimmune/autoinflammatory syndrome induced by adjuvants ("ASIA") as presented by Dr. Yehuda Shoenfeld pursuant to his so-named ASIA theory of vaccine-caused injury. Pet'r's Ex. 12 at 1. Although the authors acknowledged that "[f]urther studies are needed to support [their] observation and to elucidate the pathogenesis of the syndrome," they asserted "an association between vaccinations and CSU." *Id.* The study included 14 cases of CSU that developed within 4 weeks of the patient receiving a flu vaccine. *Id.* The authors noted that "post vaccination CSU was accompanied with other symptoms (ie, arthralgia, myalgia, chronic fatigue, orthostatic intolerance, sleep disturbances), that are typical symptoms of ASIA." *Id.* at 3. In conclusion, the study highlighted a temporal association between vaccination and CSU as evidence that CSU may be "part of the Shoenfeld syndrome." *Id.* at 5.

Dr. Horan also filed the McNeil & DeStefano[10] article which explained that "[u]rticaria [is] characterized by wheals (hives) accompanied by an itching or burning sensation [and] resolves generally within 24 hours." Pet'r's Ex. 13 at 2. They offered many allergic triggers including vaccines and identified immunologic and nonimmunologic cell activations as causes. *Id.* at 3. The article also discussed delayed-type reactions. *Id.* Most commonly manifesting as rashes, the "onset can be delayed up to [two] to [three] weeks." *Id.* The authors wrote that like all drugs, vaccines "have the potential to cause allergic reactions," but the symptoms are usually in response to "individual vaccine components, such as egg protein, gelatin, and potentially other additives." *Id.* Additionally, aside from "contact allergy and small granulomas or nodules with persistent urticaria at the [vaccination] site," there have been no documented "immediate hypersensitivity reactions" to aluminum adjuvants used in vaccines. *Id.*

### 2. Respondent's Expert, Dr. Maverakis

Respondent's expert, Dr. Maverakis, noted in his written report that Petitioner's diagnosis was never "concretely established" and asserted that the lack of photos in the record makes it difficult "to assess the severity of [P]etitioner's skin rash." Resp't's Ex. A at 11. Dr. Maverakis agreed that "[P]etitioner has a chronic urticaria, but [that] this might be due to either chronic spontaneous urticaria (CSU), recurring acute urticaria, or it may be due to an inducible urticaria."

---

[9] Saman Fatah, *Urticarial Vasculitis After Influenza Vaccination*, 35 BMJ 351 (2015).

[10] Michael M. McNeil & Frank DeStefano, *Vaccine-Associated Hypersensitivity*, 141 J. CLINICAL IMMUNOLOGY 463 (2018).

*Id.* He added that Petitioner "also has a chronic dermatitis with well-documented, dry 'asteatotic' skin." *Id.*

Dr. Maverakis defined CSU as "recurrent urticaria, angioedema, or both, for a period of six weeks or longer;" but he noted that "CSU is also called chronic idiopathic urticaria, a name that highlights the fact that other etiologies for the urticaria should be excluded before making the diagnosis." Resp't's Ex. A at 11. Dr. Maverakis then asserted that "CSU is most often due to an autoreactive immune response, which is an adaptive immune response." *Id.* at 12. He reasoned that "[a]daptive immune responses take several days to develop, and it is usually thought that in the cause of autoimmunity, the adaptive immune response evolves over months to years." *Id.* Conversely, "[a]cute urticaria can occur minutes to hours after being exposed to an allergen," with most reactions "appear[ing] within [one] hour of administration of the causative medication." *Id.* Dr. Maverakis noted that Petitioner's medical records place her vaccination time at approximately 9:33am with her symptoms starting later that evening, per Petitioner's self-reporting and her husband's affidavit. *Id.* He argued that this timing, several hours later, is inconsistent with an acute reaction.

Alternatively, Dr. Maverakis asserted that Petitioner was at risk for developing acute or chronic urticaria, due to her obesity, female sex, and history of atopy in response to penicillin and iodine dye. Resp't's Ex. A at 13. He briefly discussed inducible urticaria and pressure-induced urticaria specifically but acknowledged that "is not likely the cause of all of [Petitioner's] skin rash." *Id.* Dr. Maverakis also asserted that "Petitioner's biopsy was consistent with 'drug eruption' and allergic/irritant contact dermatitis." *Id.* (citing Pet'r's Ex. 3-6 at 3). However, Petitioner's treaters did not believe that she had contact dermatitis and "eventually called into question urticaria as a leading diagnosis." *Id.* Dr. Maverakis ultimately "accept[ed] Dr. Teuber's diagnosis of adult-onset atopic dermatitis as a viable differential diagnosis." *Id.* He referred to Petitioner's condition as adult-onset eczematous eruption. *Id.* Dr. Maverakis explained that this nomenclature fits because "a unifying theme [in the vast majority of patients with eczematous eruptions at or near Petitioner's age is] skin barrier dysfunction." *Id.* In support of this determination, Dr. Maverakis stated that Petitioner's "dry skin with ichthyosiform scaling and sometimes fissures" resulted "from non-immune mediated keratinocyte and lipid abnormalities." *Id.* In addition to her previously identified risk factors, Petitioner's history of "chemotherapy and radiation therapy for breast cancer chronically decrease[s] skin barrier function and greatly predispose[s her] to eczematous diseases." *Id.*

To explain the various manifestations of urticaria, Dr. Maverakis filed the Zuberbier et al.[11] *Guideline for the Definition, Classification, Diagnosis, and Management of Urticaria.* Resp't's Ex. A, Tab 2. Urticaria is defined as "a condition characterized by the development of wheals (hives), angioedema or both" that "needs to be differentiated from other medical conditions where wheals, angioedema or both can occur, for example anaphylaxis, auto-inflammatory syndromes, urticarial vasculitis." *Id.* at 5. It is "is a mast cell-driven disease. Histamine and other mediators, such as platelet-activating factor [] and cytokines released from activated skin mast cells, result in sensory nerve activation, vasodilatation and plasma extravasation as well as cell recruitment to urticarial lesions." *Id.* at 6. The article then explained that urticaria can manifest as an acute

---

[11] T. Zuberbier et al., *The EAACI/GA²LEN/EDF/WAO Guideline for the Definition, Classification, Diagnosis and Management of Urticaria*, 73 ALLERGY 1393 (2018).

manifestation, lasting less than six weeks, or chronic, lasting six weeks or more. *Id.* Chronic urticaria is further divided into CSU and inducible urticaria. *Id.* The authors cautioned that "diseases such as syndromes that can manifest with wheals and/or angioedema are not considered to be subtypes of urticaria, due to their distinctly different pathophysiologic mechanisms." *Id.*

One article filed by Respondent's expert identified vaccines as a cause of acute urticaria. Resp't's Ex. A, Tab 11.[12] The Frigas & Park article noted that "[t]he majority of medications may cause acute urticaria," including vaccines. *Id.* at 3. The authors detailed what constitutes definitive evidence of a cause-and-effect relationship, but noted that '[i]n most cases, all four criteria are not met and the final diagnosis is acute urticaria probably caused by medication." *Id.* The four criteria described by Frigas & Park are:

> (i)     there is a temporal relationship between taking the medication and the appearance of urticaria (medication-induced acute urticaria usually develops within 1 hour from administration of the causative medication);
> (ii)    urticaria is a recognized adverse effect of the medication in question and has been reported in the medical literature;
> (iii)   the urticaria improves or resolves following withdrawal of the medication in question;
> (iv)    and challenge or accidental re-exposure to the same medication causes acute urticaria.

*Id.*

### 3. Supplemental Reports

Both experts filed responsive expert reports. Pet'r's Ex. 15; Resp't's Ex. Dr. Horan disagreed with some of Dr. Maverakis' contentions and rebutted others. *See generally* Pet'r's Ex. 15. He noted that when CSU was previously also largely characterized at idiopathic, "the pathophysiology was not well understood." *Id.* at 2. He added that "[w]e now do understand that almost all cases of chronic idiopathic urticaria (today's CSU) are caused by a low-grade autoimmune process." *Id.* He reiterated his asserted biological mechanism.

> As stated in my previous report, in general, an IgE-mediated mechanism has been implicated as a cause in some studies via passive transfer experiments. The allergen(s) responsible in such IgE-mediated processes may include epitopes related to the influenza vaccine itself, to hemagglutinin proteins present in the vaccine or to some other material. In some cases, increased basophil releasability related to preservative 2-phenoxyethanol present in some influenza vaccines may play a role.

*Id.* at 4. Ultimately, "current knowledge of such conditions, [Petitioner's] clinical presentation, the time course of the reaction and the lack of any other precipitant contribute," to Dr. Horan's opinion that Petitioner's vaccine caused her urticaria. *Id.*

---

[12] Evangelo Frigas & Miguel A. Park, *Acute Urticaria and Angioedema: Diagnostic and Treatment Considerations*, 10 AM. J. CLINICAL DERMATOLOGY 239 (2009).

11

Dr. Maverakis responded to Dr. Horan's assertion that Petitioner's urticaria is a timely autoimmune reaction to her vaccination by reiterating that an adaptive immune response requires time for antibody titers to rise and attack self-antigens. Resp't's Ex. C at 3. He further noted that Dr. Horan did not provide supporting literature for his criticisms of Dr. Maverakis' opinions, including potential alternative causes for Petitioner's urticaria, or the time necessary for an adaptive response to manifest. *Id.* at 2–9.

## IV.    Applicable Legal Standards

To receive compensation under the Vaccine Act, a petitioner must demonstrate either that: (1) the petitioner suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at § 14, as modified by 42 C.F.R. § 100.3; or (2) that petitioner suffered an "off-Table injury," one not listed on the Table, as a result of his receiving a covered vaccine. *See* § 11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006). Petitioner does not allege a Table injury in this case; thus, she must prove that her injury was caused-in-fact by a Table vaccine.

To establish causation-in-fact, a petitioner must demonstrate by a preponderance of the evidence that the vaccine was the cause of the injury. § 13(a)(1)(A). A petitioner is required to prove that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321–22 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)).

In the seminal case of *Althen v. Sec'y of the Dept. of Health & Hum. Servs*, the Federal Circuit set forth a three-pronged test used to determine whether a petitioner has established a causal link between a vaccine and the claimed injury. *See* 418 F.3d 1274, 1278–79 (Fed. Cir. 2005). The *Althen* test requires petitioners to set forth: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. To establish entitlement to compensation under the Program, a petitioner is required to establish each of the three prongs of *Althen* by a preponderance of the evidence. *Id.* "[C]lose calls regarding causation are resolved in favor of injured claimants." *Id.* at 1280. Further, evidence used to satisfy one prong of the test may overlap to satisfy another prong. *Capizzano,* 440 F.3d at 1326.

Under the first prong of *Althen*, a petitioner must offer a scientific or medical theory that answers in the affirmative the question: "can the vaccine[] at issue cause the type of injury alleged?" *Pafford v. Sec'y of Health & Hum. Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. den'd*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such theory must only be "legally probable, not medically or scientifically certain." *Id.* at 548–49. Petitioners are not required to identify "specific biological mechanisms" to establish causation, nor are they required to present "epidemiologic studies, rechallenge[] the

presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities." *Capizzano,* 440 F.3d at 1325 (quoting *Althen*, 418 F.3d at 1280). Scientific and "objective confirmation" of the medical theory with additional medical documentation is unnecessary. *Althen*, 418 F.3d at 1278–81; *see also Moberly*, 592 F.3d at 1322. However, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (citing *Moberly*, 592 F.3d at 1322). Indeed, the Federal Circuit has "consistently rejected theories that the vaccine only 'likely caused' the injury and reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019) (citing *Moberly*, 592 F.3d at 1322 and *LaLonde*, 746 F.3d at 1339). Rather, "[a] petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case." *Moberly*, 592 F.3d at 1322. In general, "the statutory standard of preponderance of the evidence requires a petitioner to demonstrate that the vaccine more likely than not caused the condition alleged." *LaLonde,* 746 F.3d at 1339.

Furthermore, establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357,1361 (Fed. Cir. 2000). The Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* requires that courts determine the reliability of an expert opinion before it may be considered as evidence. 509 U.S. 579 (1993). However, in the Vaccine Program, the *Daubert* factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("[U]niquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted."); *see also Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)). Under *Daubert*, the

> factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

The *Daubert* factors are "meant to be helpful, not definitive." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The factors do not "constitute 'a definitive checklist or test'" and may be applied differently depending on the facts of a particular case. *Id.* at 150 (quoting *Daubert*, 509 U.S. at 593).

"In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590 (citation omitted). Thus, for Vaccine Act claims, a "special master is entitled to require some indicia of reliability to support

13

the assertion of the expert witness." *Moberly*, 592 F.3d at 1324. Nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also D'Tiole v. Sec'y of Health & Hum. Servs.*, No. 15-085V, 2016 WL 7664475, at *24 (Fed. Cl. Spec. Mstr. Nov. 28, 2016) (stating that the Vaccine Act "require[s] a chain of reliable propositions supporting [a] petitioner's theory").

Under the second prong of *Althen*, a petitioner must prove that the vaccine actually did cause the alleged injury in a particular case. *See Pafford*, 2004 WL 1717359, at *4; *Althen*, 418 F.3d at 1279. The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). A petitioner does not meet this obligation by showing only a temporal association between the vaccination and the injury; instead, the petitioner "must explain *how* and *why* the injury occurred." *Pafford*, 2004 WL 1717359, at *4 (emphasis in original). The special master in *Pafford* noted petitioners "must prove [] both that her vaccinations were a substantial factor in causing the illness . . . and that the harm would not have occurred in the absence of the vaccination." *Id.* (citing *Shyface*, 165 F.3d at 1352). A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hodges v. Sec'y of Health & Hum. Servs.,* 9 F.3d 958, 961 (Fed Cir. 1993) (citation omitted). Nevertheless, "[r]equiring epidemiologic studies . . . or general acceptance in the scientific or medical communities . . . impermissibly raises a claimant's burden under the Vaccine Act and hinders the system created by Congress." *Capizzano*, 440 F.3d at 1325–26. "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen*, 418 F.3d at 1280.

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). Indeed, when reviewing the record, a special master must consider the opinions of treating physicians. *Capizzano*, 440 F.3d at 1326. This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause-and-effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (finding that a special master must consider the context of a medical encounter before concluding that it constitutes evidence regarding the absence of a condition). While a special master must consider these opinions and records, they are not "binding on the special master or court." § 13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record." *Id.*

To satisfy the third *Althen* prong, a petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This

14

"requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after the administration of a vaccine for the vaccine to be the cause." *Id.* However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination and the injury are causally linked." *Id.*; *see also Locane v. Sec'y of Health & Hum. Servs.*, 685 F.3d 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

Although a temporal association alone is insufficient to establish causation, under the third prong of *Althen*, a petitioner must also show that the timing of the injury fits with the causal theory. *See Althen*, 418 F.3d at 1278. The special master cannot infer causation from temporal proximity alone. *See Thibaudeau v. Sec'y of Health & Hum. Servs.*, 24 Cl. Ct. 400, 403–04 (1991); *see also Grant*, 956 F.2d at 1148 ("[T]he inoculation is not the cause of every event that occurs within the ten[-]day period . . . [w]ithout more, this proximate temporal relationship will not support a finding of causation." (quoting *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir. 1983))).

A petitioner who satisfies all three prongs of the *Althen* test has established a prima facie showing of causation. *Hammitt v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 719, 726 (2011). A petitioner who demonstrates by a preponderance of the evidence that he suffered an injury caused by vaccination is entitled to compensation unless the respondent can demonstrate by a preponderance of the evidence that the injury was caused by factors unrelated to the vaccination. *See Althen*, 418 F.3d at 1278; *Knudsen*, 35 F.3d at 547. In such a case, the government must not merely prove the existence of an alternative cause, but that such an alternative actually caused the injury. *Knudsen,* 35 F.3d at 549. Consequently, when and if the petitioner establishes a prima facie case, the burden then shifts to the government to prove that an alternative cause, unrelated to the administration of the vaccine, was the "sole substantial factor" in causing the alleged injury. *See de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1354 (Fed. Cir. 2008); *see also Hammitt*, 98 Fed. Cl. at 726 (explaining that the respondent's burden is to show that the "factor unrelated" was the "sole substantial factor" in causing the injury). Additionally, a factor unrelated "may not include 'any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness or condition.'" § 13(a)(2); *see also Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349 (Fed. Cir. 2010) (stating that an idiopathic diagnosis cannot be a "factor unrelated," as it is idiopathic).

## V.    Discussion

### A.    Causation

Dr. Horan categorized Petitioner's condition as urticaria resulting from a vaccine-caused hypersensitivity reaction. Dr. Maverakis did not agree that Petitioner's condition should be diagnosed as urticaria. Nonetheless, he assessed a potential link between the flu vaccine and CSU with symptom manifestation within 12 hours and disputed the viability of Dr. Horan's theory. After a review of the entire record, including the medical literature filed in this case, and assuming

15

arguendo that the relevant condition is urticaria, Petitioner has presented preponderant evidence that the flu vaccine can cause acute urticaria. However, Petitioner has not presented preponderant evidence that the flu vaccine can cause chronic urticaria or CSU.

Dr. Horan cited several articles in support of his contention that the flu vaccine can cause skin conditions, including urticaria. For example, McNeil & DeStefano noted that while all drugs "have the potential to cause allergic reaction[s, v]accine antigens themselves rarely, if ever are the cause." Pet'r's Ex. 13 at 3. The authors explained that when vaccines do cause reactions, they are usually to the added vaccine components (such as egg protein), and they manifest as "contact allergy and small granulomas or nodules" at the vaccination site. *Id.* at 2. Dr. Horan does not assert this mechanism for this case. The authors further explained that "[p]ostvaccination acute-onset hypersensitivity reactions [can also] include self-limited localized adverse events and . . . anaphylaxis." *Id.* at 1. Dr. Horan did not assert these manifestations in this case.

The McNeil & DeStefano article continued, and the authors definitively stated that "medications (including vaccines), are commonly considered and sometimes confirmed as the cause of acute urticaria." Pet'r's Ex. 13 at 3. The authors noted that this type of urticaria "resolves generally within 24 hours." *Id.* Dr. Maverakis also did not dispute this conclusion and filed literature that stated that "the majority of medications may cause acute urticaria," including vaccines. Resp't's Ex. A, Tab 11 at 3. Acute urticaria is then defined in another reference as a condition that lasts for less than six weeks. Resp't's Ex. A, Tab 2 at 6. Dr. Horan adopts that definition in his supplemental report, noting that allergists use the term "acute" in reference "to the duration of [urticaria] symptoms, acute being less than six weeks." Pet'r's Ex. 15 at 2. Despite this agreed upon definition, the literature explains that "[t]he majority of acute-onset reactions are type I hypersensitivity reactions mediated by preformed IgE antibodies against a vaccine component." Pet'r's Ex. 13 at 2. The authors did not refer to acute urticaria, but an acute-onset reaction. This appears to relate to the symptom onset, and the authors noted that "[t]ypically, these reactions occur within minutes of exposure to the relevant allergen, and most normally occur within [four] hours; possible exceptions might include delayed-onset reactions to rabies and Japanese encephalitis vaccines." *Id.* Urticaria is defined as one of the most common manifestations of such a reaction, but the flu vaccine is listed as an exception. *Id.* The authors then go on to note that in these cases, the hallmark symptom of urticaria (hives) "resolves generally within 24 hours." *Id.* at 3. These statements, found in the section labelled: Allergic Reactions to Vaccines, establish that the authors are specifically referring to an acute urticaria that also has an acute onset. Within the same section regarding vaccines, the authors also provide the quote relied upon by Dr. Horan that "[d]elayed-type reactions occur commonly within hours or days after exposure, although symptom onset can be delayed up to 2 to 3 weeks." *Id.*

Dorland's Medical Dictionary provides distinct definitions for categories of hypersensitivity reactions per the Gell and Coombs classification, including a type I immediate hypersensitivity reaction that is mediated by IgE antibody, and a type IV cell-mediated hypersensitivity reaction "initiated by antigen-specific T lymphocytes," where "reactions take one or more days to develop." *Hypersensitivity Reaction, Type IV,* DORLAND'S. Dr. Horan's reports did not assert a mechanism of cell-mediated hypersensitivity associated with delayed hypersensitivity-reactions. Further, he did not rely on the literature's mention of alternative causal mechanisms, including "complement activation, by immune complexes (type 3 hypersensitivity or

16

an Arthus reaction) or other less-well defined mechanisms, including T cell–mediated processes." Pet'r's Ex. 13 at 3.

Dr. Horan instead cast Petitioner's reaction to flu vaccine components as an IgE-mediated hypersensitivity, commonly known as type I, but asserted that "the precise molecular pathway inciting urticaria cannot be specified." Pet'r's Ex. 7 at 4. He clarified that urticaria is considered to be an immediate reaction but it is possible to have a delayed onset. The McNeil & DeStefano article also stated that urticaria can occur with delayed reactions that "might be the result of non-IgE mediated processes . . . or less likely late activation of the IgE system." Pet'r's Ex. 13 at 3. Throughout his reports, Dr. Horan maintained that his causation theory involved an IgE mediated process and rendered the evidence of a non-IgE driven, delayed reaction inapplicable to this case. And while Dr. Horan focused on the literature's discussion of a delayed or late activation reaction manifesting as a rash up to two to three weeks post vaccination in rare cases, the article did not specifically name chronic urticaria as a vaccine-caused injury. In fact, there is no evidence that this reasoning applies to chronic urticaria. Given that Petitioner's hives lasted over eight months, there is not persuasive evidence in the record that a biological mechanism for acute urticaria would be relevant here. Notably, Dr. Horan did not specifically address this point. The case study that was filed describing urticaria following a flu vaccine involved an 11-year-old girl with acute urticaria that last for nine days with no recurrence. Pet'r's Ex. 11 at 2. Two additional case studies described anaphylaxis and urticarial vasculitis, respectively. There is no assertion that Petitioner suffered from either of these substantially different conditions. Moreover, by Dr. Horan's own admission, he did not believe a type IV hypersensitivity reaction is at play in this case – however, based on the evidence provided, it would be the only form of hypersensitivity reaction which would present with a delayed onset following vaccination. Accordingly, there is not preponderant evidence of a type IV hypersensitivity reaction.

Lastly, Dr. Horan filed literature that contemplates Dr. Shoenfeld's ASIA theory. *See* Pet'r's Ex. 12. The ASIA causation theory has been universally rejected by special masters in the Program, including myself. *D'Angiolini v. Sec'y of Health & Hum. Servs.*, 122 Fed. Cl. 86, 101 (affirming the special master's rejection of the theory as "still developing and incomplete), *aff'd*, 645 Fed. Appx. 1002 (Fed. Cir. 2016); *Garner v. Sec'y of Health & Hum. Servs.*, No. 15-0063V, 2017 WL 1713184, at *15 (Fed. Cl. Spec. Mstr. Mar. 24, 2017); *Nifakos v. Sec'y of Health & Hum. Servs.*, No. 14-236V, 2021 WL 1345218, at *6 (Fed. Cl. Spec. Mstr. Mar. 4, 2021); *Decker v. Sec'y of Health & Hum. Servs.*, No. 15-017V, 2020 WL 7889059, at *33 (Fed. Cl. Spec. Mstr. Dec. 14, 2020) (noting that other cases have found the theory to be "overbroad, generalized, and vague, to the point that it could apply to virtually everyone in the world who received a vaccine containing an adjuvant"). It is rarely if ever asserted in pending cases and the theory has been widely rejected in the medical community as a viable explanation for vaccine-caused injury. More importantly, while Dr. Horan filed literature that discussed ASIA, he did not focus on it in his follow-up reports, and it is not mentioned when Dr. Horan explicitly articulated his causation theory in direct response to a criticism from Dr. Maverakis. *See* Pet'r's Ex. 15 at 4. In sum, while a careful review of the record shows that Petitioner has provided preponderant evidence that the flu vaccine can cause acute urticaria, Petitioner has not presented preponderant evidence that the flu vaccine can cause chronic urticaria. Accordingly, Petitioner has not satisfied the first *Althen* prong.

## B.  Clinical Presentation, Diagnosis, and Specific Causation

In Petitioner's motion for a ruling on the record, she stated that she suffered from "an adverse skin reaction, including, urticaria, rash, and hives," as a result of receiving a flu vaccine. Mot. at 1. In support of her assertion, Petitioner submitted evidence that she received her flu vaccine on the morning of September 29, 2017, and later that evening, started experiencing skin symptoms including itchy rash with welts on her upper body that progressed to her legs, neck, back, and scalp. Her medical records detail the evolution of her diagnosis. Days after her vaccination, Petitioner was seen by KP and assessed with dermatitis. Pet'r's Ex. 3-5 at 2431. Her symptoms worsened over a period of three weeks, and she was again seen by treaters at KP who noted psoriasis as a possibility. *Id.* at 2471. By the end of September, Petitioner's rash had persisted despite multiple steroid courses and continuous antihistamines. *Id.* at 2498. She had developed mild scaly macules and papules on her thighs, legs, arms, palms, lower back, and trunk. *Id.* at 2499. At this point, dermatologist, Dr. Kuo's impression was dermatitis vs. urticaria. *Id.* He also noted a potential dermal hypersensitivity reaction. *Id.* Dr. Kuo opined in mid-November that he believed that the flu shot was the cause of Petitioner's skin condition, which could be dermal hypersensitivity, hives (urticaria), or most likely, a drug rash. Pet'r's Ex. 3-6 at 2527. The dermatitis/urticaria differential remained the impression through January of 2018. When Petitioner was seen by an allergist, Dr. Teuber noted mild diffuse wheals on her torso and thighs. At this point, Petitioner's symptoms had persisted for months beyond the six weeks characteristic of acute urticaria, and Dr. Teuber's impression was chronic urticaria of unknown etiology and uncertain significance. *Id.* at Pet'r's Ex. 2 at 88–91. Despite this assessment, Dr. Teuber observed that Petitioner's rash was "not typical of urticaria. Very pruritic." *Id.* at 82. The lack of diagnostic clarity due to the stagnant nature of her rash and the long duration of her symptoms caused Dr. Teuber to ultimately settle on a non-urticarial rash. *Id.* at 78–79. Petitioner saw Dr. Kuo in February of 2018, and his impression was dermatitis, possibly due to the flu shot, despite his acknowledgement that hypersensitivity reactions don't generally last several months. Petitioner noted that the hives began to improve after more than eight months, but scarring remained. In fact, there is no dispute about the severity or duration of Petitioner's relevant symptoms.

Dr. Horan asserted that Petitioner developed urticaria, and the record certainly provides support for that opinion. Pet'r's Ex. 7 at 4. Dr. Maverakis observed "from [her medical record] assessments, it appears that [P]etitioner has a chronic urticaria, but this might be due to either [CSU], recurring acute urticaria, or it may be due to an inducible urticaria." Resp't's A at 11. He added "[s]he also has a chronic dermatitis with well-documented, dry asteatotic skin." *Id.* It is not necessary for me to reach a conclusion about the sufficiency of evidence for dermatitis, because the experts both identify and contemplate a urticaria diagnosis. Dr. Horan does not dispute the chronic nature of Petitioner's condition, and the evidence is overwhelming that her rash lasted for longer than the six weeks that limits acute urticaria. Dr. Maverakis is ultimately more of the opinion that Petitioner "has skin barrier dysfunction, making a diagnosis of 'adult-onset atopic dermatitis' or related eczematous entity a likely possibility." *Id.* at 14. However, there is not preponderant evidence to support this diagnosis such that it outweighs the evidence in the medical records by Petitioner's treaters, Dr. Horan's expert opinion, and Dr. Maverakis own analysis of some form of urticaria. The record contains preponderant evidence that Petitioner suffered from chronic urticaria.

18

Although Petitioner did present preponderant evidence of vaccine-caused urticaria, that theory is limited to acute urticaria. Indeed, the persistent nature of chronic urticaria is incompatible with the reasoned basis for vaccine-induced acute urticaria, because once the allergic antigen is dispersed, the reaction subsides and does not automatically recur. *See* Pet'r's Ex. 13; Resp't's Ex. A, Tab 11. After careful review, the record does not reflect preponderant evidence that Petitioner suffered from acute urticaria caused by a flu vaccination via her asserted theory, nor is there evidence that Petitioner's chronic urticaria was caused by a flu vaccination via any other mechanism.

### C. Timing

Petitioner submitted evidence that she received her flu vaccine on the morning of September 29, 2017, and started experiencing skin symptoms later that same evening. Petitioner's medical records include documentation of a telehealth call on October 2, 2017, during which she complained of an itchy rash with welts on her upper body that had remained for three days, i.e., since her vaccination date. She consistently provided this time frame as she saw various treaters to include her PCP and dermatological specialists. Additionally, the affidavits filed by Petitioner and her husband explained that she developed a rash in the evening hours following her vaccination. In fact, there is no dispute that Petitioner's relevant symptoms began the same night as her vaccination. Petitioner has presented preponderant evidence that a hypersensitivity reaction resulting in acute urticaria can present with a delayed onset of several hours. However, as stated previously, this logical sequence of cause and effect does not naturally extend to chronic urticaria. For example, Dr. Horan did not explain how the time period articulated for a localized contact allergy could be extrapolated to a diffuse series of hives that covered most of Petitioner's body and appeared simultaneously on both arms and her chest. Furthermore, the medical literature often specifically designates a focus for the authors on acute or chronic urticaria for analysis. Petitioner has not presented preponderant evidence of a viable theory for chronic urticaria. Consequently, there is no appropriate time frame to consider for Petitioner's case.

## VI.    Conclusion

After a careful review of the record, Petitioner has failed to prove by preponderant evidence that her urticaria was caused-in-fact by her September 29, 2017 flu vaccination. Accordingly, Petitioner's is not entitled to compensation. Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a).[13]

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master

---

[13] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.